The first case, Leiva v. Warden. Good morning and may it please the court. My name is David Marcus and I represent Andres Arias. I'd like to cut right to the heart of it as you say, Judge Marcus, which is there is no treaty in force between the United States and Colombia. This court has repeatedly said so, quote, the Colombian Supreme Court annulled the extradition treaty altogether, finding its ratification unconstitutional. And that's not a one-off statement in one case in a indicta. This court has repeatedly said so, and it was the central holding of a case called Valencia Trujillo. In that case, the defendant raised the very same argument that the government should apply. And this court held no, there was no treaty in force. The treaty cannot govern therefore, and the rule of specialty was inapplicable. And so that was the central holding. What are we to make of the fact that in this case, the State Department tells us in a sworn manner, the treaty is still in force in effect as far as the United States is concerned. And the Colombians tell us, or at least somebody from Colombia purporting to speak for Colombia tells us this treaty is still in force and effect. What do we make of that fact? Or really those assertions both by the two sovereigns that signed and ratified the treaty? Right. I guess a couple points about that. First, both sovereigns recognize that the treaty has been declared unconstitutional. That fact is undisputed. It will be undisputed this morning. And it's been said repeatedly. So when you say that it's been declared unconstitutional, what was struck down was the provision in Colombia that implemented the treaty, right? Correct. It was not ratified. What the Colombian Supreme Court said, and this is in the note from the Republic of Colombia, that the treaty was struck down, declared unconstitutional because it was not properly ratified. And what that note says, which is docket entry 54-1, is that because it was struck down, extradition in Colombia is determined solely internally, by internal laws, and not through the treaty. And really no one has ever contested that, Judge Marcus. I mean, in the court below, the government lawyer admitted, quote, the United States agrees that it is Colombia's view that the treaty is not in effect. And that's at docket entry 53, page 25. The government also admitted, quote, the government of Colombia is not requesting Arias's extradition based on the treaty. So there's no real dispute here that the treaty is not in effect in Colombia. And there is no such thing as a one-sided treaty, of course. Treaties have to be bilateral. Has the United States ever stated that it does not think that the treaty is in effect? Yes. The State Department in a cable, which we filed as supplemental authority on January 18th, the State Department said internally that there is no treaty, and that they need to negotiate, the government, the US government should negotiate an actual treaty to avoid confusion. This was a State Department cable filed by the government in the Valencia Trujillo case. We uncovered that and filed it as supplemental authority just this year. So even the State Department itself has admitted that there is no treaty in force. Let me ask, come back again to where I began, and ask you then to help me with the presentation from the Colombian government, which asserts that the treaty of extradition between the Republic of Colombia and the United States signed on quote, continues currently in force in accordance with the international law, as provided by Article 21 subsection 4 of the same treaty and of Article 54 of the Vienna Convention, as neither the Republic of Colombia nor the United States of America have notified themselves of their intention of terminating it. Would it discard it because of what the Colombia says, Your Honor? In the previous paragraph, they admit that extradition, quote, extradition requests that the United States of America presents to Colombia cannot be processed, neither granted or denied in accordance with the treaty. And so Colombia asserts a number of facts which we agree with. The legal conclusion which you just quoted is where the disagreement comes and what this case is about. So to frame the issue, I guess, slightly differently, if the facts are in agreement, which is Colombia doesn't follow the treaty. That fact is in agreement by both sides. Let me ask the question in a slightly different way. Yes. And I guess what it boils down to is whether the treaty has been voided or whether it's voidable. That's maybe one way to frame the question. And I ask the question this way. I think it's clear, one, that the or at least some people to the United States pursuant to request, pursuant to what they characterize as their local law. Correct. And two, we continue to extradite people to Colombia, not pursuant to local law, but pursuant to the treaty obligations signed by the Senate. Correct. So there's a sort of asymmetry in how the treaty is handled. One side continues to give literal meaning and send people based upon it if other things are met. And the other side continues to extradite, but not based on the treaty. Would that make the treaty null and void or would that treaty be voidable, which the parties could have formally dumped simply by going through the mechanism of termination, but which they did not do? Null and void, because if you look at Article 21... You understand the heart of my question. Of course. And if we look to the treaty itself, Article 21.1 said the treaty has to be properly ratified. Colombia says it wasn't. And so the treaty is void. In fact, this court said it, which the word this court used was that the treaty was annulled. But I just want to be clear on one factual point you made and just to be clear on it. Where was it annulled? Is that in Valencia? The word annulled was used in Duarte, Acero, Your Honor. And just to be clear about when Colombia sends people here to the United States pursuant to the internal law, it doesn't always do that. And if there was a treaty, they would. So one of the things that runs through all the cases is that conduct controls. Here, Colombia never, ever extradites pursuant to the treaty. And oftentimes... But why can't one side agree to be bound by the treaty and the other side not? And still have a treaty that's in effect? Is it necessarily void where one side complies and the other does not at least in name under that treaty? Absolutely. A treaty must be bilateral. That's black letter law. First of all, under the treaty itself, Article 1 says that it has to be reciprocal. Both sides have to do it if the treaty is in effect. But also the Senate would never have approved a one-sided treaty where only the United States is forced to comply. Remember in this case, and we've seen it lots... Right, but the Senate chose not to terminate it. There's nothing to terminate, Your Honor. There is a terminating process, isn't there? Yes, if... Isn't there a talks about how a sovereign nation can otherwise dump a treaty that it had entered into? Yes. And what was that process? No, you would have to give... If one wanted to formally terminate a treaty, what would you do? If there was a treaty to formally terminate it, you'd have to give notice to the other side. Okay. Was any notice given by the United States? No, Your Honor, because there is no treaty in effect. So there is no treaty for the United States to disavow. And we know that from Article 21.1 of the treaty. We also know it through the conduct of both... If it's true, as you say, that one side can void a treaty by their conduct, just how closely is an Article 3 court to look at the conduct of the other party to determine that they've voided it? My argument is not that the conduct shows that they voided it, but the conduct shows that it was never put into force, Your Honor. So here, for the last 30 years, and I would challenge the government to get up and dispute this, for the last 30 years, Colombia has never extradited pursuant to the treaty, ever. And that's because it was never put into force. So it's not that we're arguing that at some point Colombia decided to void the treaty and to stop doing it. It's that it has never done it. It's been found unconstitutional in Colombia. And so there is no treaty in effect. And all of the conduct by Colombia shows that, especially recently, where they're saying, we're not going to extradite FARC terrorists and murderers. I mean, they've come out and said it. The President, President Santos says, there's no treaty. We don't have to do that. I see my time somehow running out. All right. It's an interesting and important case. So you're on our time here, counsel, not on yours. Did your client ever file a petition for asylum? And if so, what is the status of that? Yes, Your Honor. So he did file a petition for asylum as soon as he got here to the United States. That asylum petition was pending for two years before the extradition request. And I just, I think it's a really important point. If the court agrees with us that there is no extradition treaty in force, it's not like he gets a free pass and gets to stay here. He would have to go through that asylum process. If he doesn't get asylum, he'll be deported. What is the status of it now? You said it's just pending before the IJ? It's never, it's never been acted on? Correct. Has the government responded to it? The government initially responded to it. In fact, Mr. Arias was set to be interviewed by immigration on that asylum petition, and that was canceled, Judge Hall. And so that asylum petition is pending. Where was it filed? Here in Miami. So there's been no resolution of that? Correct. Correct. And so what that means is, if we win this case, he would just be going through that asylum petition. If he's granted asylum... Has there been even an order of removability or anything happened there, and he's just asking not to be removed, or it's just a petition for asylum? Just a petition for asylum. Right. But if you're right in this case, there is no treaty. Therefore, the United States had no jurisdiction to send him back. Pursuant to the treaty to Columbia, whether he gets asylum or not, he couldn't be sent back to Columbia by the United States, could he? He couldn't be sent back pursuant to the extradition treaty, but he could be deported through the immigration process if he has no status. So the next step would be, if he's granted asylum... So even if you win, they can remove him? If he's not granted... Theoretically, if he's not entitled to asylum on the grounds of a well-founded fear of political persecution. Right. Which we think he would be that the Colombian Supreme Court pursued him politically. There's been lots of reports on this that may be outside of the area of this argument, but that's well-documented that he was politically pursued after he lost the presidency. His rival initiated this criminal lawsuit in Columbia, and it's been found later to have been politically motivated and not supported. Let me ask you a different question that's beyond the question of whether there's jurisdiction and whether there is a treaty. The requirement of finding probable cause that there is a charge in violation of Columbia law, and then we turn to dual criminality, and it's dual criminality that I want to ask you about, and I'm seeking your thoughts about. On dual criminality, the United States has got to show that the crime, the nature of the criminal penal law in Columbia has some comparable statute here, and they've got to show that the crime charged there, if you will, states a claim for a crime here under an American statute. We agree. So to the extent you're looking at 641 as the criminal statute under Title 18 here, the charges there have to state a crime under 641 here. Yes, Your Honor. And they have to state a crime under 1001 here. Those are the two comparators the government offers in the case. Is it enough to establish that the acts charged are made criminal by both laws, or is there some requirement that there be a corpus of evidence that actually shows that the conduct is a violation of the law? Is it enough to charge, or do you have to, extradition review, in some sense, the evidential foundation? Do you understand my question? Yeah. In some sense, you have to look at the facts because the facts here show that he didn't take any action. I guess what I'm saying, you have to look at the facts, but if you assume that they're true, you ask whether it states a violation of 641 or 1001. Correct. But I'm asking whether there's an additional requirement beyond that. Well, we're not... Does the extraditing court also have to find, and are you asserting that they have to find, that there was some evidence in the record there that supports the 641 here? Well, we... Not that the crime as stated wouldn't state a claim, but there's actually some proof to support the charge. There has to be some proof, of course, to support the charge, Your Honor, but one of the things that we allege here, that's a different wrinkle, I think, and goes to probable cause, is the idea that this was done by a corrupt court, and we were never allowed to pursue that in the court below. We were able to show, at least initially, by a promofacia case, that the lead Supreme Court judge was bribed, was politically motivated. The State Department's cable said that we have to be careful because they're politically motivated. But I'm asking, let's hold the charge of corruption aside just for a moment. Is it true, and do you accept that it is the law that an offense is extraditable if the acts charged are criminal by the laws of both countries? If there is some evidentiary support for that, yes, and so... But that's not what I said. I was reading you something from the Supreme Court of the United States, it's an old case, but to my, the best I can tell, it remains good law. It is true that an offense is extraditable, the Supreme Court says, only if the acts charged are criminal by the laws of both countries. The focal point is the acts charged. It doesn't say that you got to put evidence in to support it. It's enough that if you believe the allegata in the charge, it would state a crime under American law. Right, but there's still... Is that right, or do you have to do more? There's a little more, Your Honor, and that's... What's the little more, and what's the source for the fact that there is more? So, it's based on probable cause, and the reason that we don't just let the executive arrest and send somebody, and that the judiciary has to go over it and look through it, is the same as probable cause for like a warrant, or things like that. The probable cause analysis looks to the other side of the coin, whether what they've charged states a crime, and whether there's some evidence to support a crime in violation of the foreign sovereign's law. That's not what I'm asking about. I got it. You understand, okay. I got it, and all I would say here is, and maybe there's not much of a dispute, because the facts here, I think, are agreed on in that it was Minister Arias acting in his official capacity as Minister of Agriculture. So, I'm willing to assume that fact as true for purposes of this argument, and then what does that mean for purposes of extradition? And under duality, that's... He hasn't committed a crime under 641. He never made a penny in this case, and... I wouldn't have to make money out of it, would he? Yes, your honor. I could commit a fraud in the United States. I could deceive Uncle Sam and steal all the money to you, simply because I like you. And I would be as guilty as if I had taken the money and put it in my own pocket. Right. So, if he, Arias, was intentionally stealing for somebody else, that's a different story. But under the active state doctrine and under the facts of this case, that's not what's alleged, your honor. What's alleged is that he did a program pursuant to his official role as Minister of Agriculture. Did they ever charge that he personally profited from the fraud? No. I thought their theory of the case was quite the contrary, that he had these buddies and these friends in Columbia who profited from his corruption. No, there's no allegation that he knew those 11 families that were able to subdivide their property. In fact, those 11 families testified that they did not know Arias. The whole theory of prosecution is that he benefited politically, that these people might vote for him, which, if that's going to be a crime here in the United States... Let me put it just as sharply as I can. Do I have to look at the Colombian Supreme Court record, there's 157 pages in their opinion, and ask the question of whether the evidence was sufficient to sustain a conviction? No, you don't have to do that, your honor. You have to look at the evidence to see if that was a crime here in the United States, which is a slightly different question. Thanks very much. And you have reserved your five minutes for rebuttal. Thank you. Morning, your honors. And may it please the- Good morning. Christopher Smith for the United States. And it's my pleasure to be joined today by my colleague from the Office of International Affairs, Rebecca Hachisky, as well as Assistant United States Attorneys Robert Emery and Emily Smachetti. Your honors, we are aware of no case in the history of the republic when a federal appellate court has held that a treaty is not in force when the United States Department of State says that it is. The record and the law in this case leave no doubt that it should not be the first. The United States Department of State has repeatedly reaffirmed- Suppose the foreign government had formally terminated the treaty, and we had not. And we walked, you walked in here with a declaration from the Secretary of State, and you said, this treaty's still good as far as the State Department is concerned, notwithstanding the fact the foreign sovereign had done everything it had to do under the Vienna Convention and terminated it. Your honor- What you said would be utterly at war with the fact pattern. Would we be required as appellate court to rest upon the assertion by the Department of State under those circumstances? Your honor, I think it would, your hypothetical would turn on one point, and that's whether or not the Department of State itself recognized that it had received the termination under Article 21 of the- Let's suppose it did. Your honor, in Seine v. Shipley- State Department recognizes and says, as far as we're concerned, we're still giving the treaty force in effect because we haven't given notice, we haven't terminated, and we're still extraditing. Your honor- We don't really care what they do. The way that I would look at that situation is Seine v. Shipley, a case from the old Fifth Circuit, made clear that the deference is strong, but it's not conclusive. Okay, so it's not a question of saying this is a political question beyond the can of a court. If there's no treaty, the fact that you say there's a treaty doesn't make it so, and we would be obliged to examine that question, wouldn't we? At least in an extreme fact pattern. Your honor, in an extreme fact pattern, the principle that I would turn back to is the Second Circuit statement in Franklin Mint Court, that Article III courts are bound to observe the line between interpreting a treaty on one hand and veering into the lane of ratification- Which is another way of saying we would give great, great deference to the State Department's view, but it wouldn't be plenary and unreviewable. I think- Is that a fair statement? That's a fair statement, except perhaps when it comes to ratification, due to the Supreme Court's decision in Braden in 1853. In that decision, the court expressly held that whether or not a foreign government had initially ratified the treaty is, in effect, a non-justiciable political question. That situation is a little bit different from the one that your honor hypothesizes here, because I think in the situation your honor hypothesizes here, there is a case to be made that the court could interpret the treaty terms itself to make such a finding that that might be- That might be right, but that would be different from saying what you said at the very start, the first words out of your mouth in the very first sentence you uttered, was that it would be the first time in history for an appellate court to turn around and say, we're not going to give force and effect to what the State Department pronounced. It would, your honor. That may be descriptively accurate, but that's different from saying the court would be beyond its power and indeed beyond its obligation if there was nothing on the other side to support it. If there was an extreme hypothetical along the lines that your honor posits, that might be the case. Okay, so accepting the proposition now that the court would be obliged to make that analysis, we know at least this much. We know that there was a treaty, we signed it, the Senate entered into it, we know that it looked like the Colombians did, and then the Colombian Supreme Court said the ratification process is no good because the wrong guy signed it. And so as far as we're concerned, there is no treaty that's enforceable, at least as far as we're concerned, and we will extradite nobody pursuant to the treaty. I'd push back on that point, your honor. Is that overstated? I think so, your honor. I mean, how? Turn to the Colombian diplomatic note that's in the record at record entry 54-1, and as your honor quoted before, the Colombian government itself is recognizing both that the treaty is in force and additionally that this specific extradition request, quote, that this request was submitted at the request of the Supreme Court of Justice of Colombia with the understanding that the United States of America would process it based on the treaty of 1979 and that extradition would be granted on that basis. The sovereign Colombian government through this diplomatic note has expressly stated that the decision of its Supreme Court to which your honor refers, the 1986 decision, had effect only internally in Colombia. And a crucial point, your honor, that I- What does that mean? Your honor, I think sometimes the Second Circuit explained this well in a case called Avero Belgium Insurance, that ratification at times is colloquially used to mean some sort of internal governmental approval process. But under international law, Article 2 of the Vienna Convention on the Law of Treaties, what ratification is, is it is the external manifestation from one sovereign to another of consent to be bound. What did the Colombians do to ratify the treaty? I'm sorry, your honor? What did the Colombian government do to ratify this treaty? As a matter of international law, the Colombian ratification of the treaty was when they exchanged the instruments of ratification in 1982. That was the manifestation to the United States of the Colombian intent to be bound by the treaty. They may have had, indeed they did have an internal approval process in Colombia that was questioned and held to be invalid in that 1986 decision. But that's apart from the fact of ratification under international law. Article 21 of the treaty, simply interpreting it textually, provides that the treaty comes into force when instruments of ratification are exchanged. It's uncontested, so far as I can tell in this case, that instruments of ratification were exchanged in 1982 on this treaty. Therefore, by the treaty's own terms, it came into effect on that date. And as your honors have mentioned before- What significance, if any, are we to attach to the pronouncements by the Colombian Supreme Court about this treaty? Your honor, the significance that we should attach to that is what the Colombian government tells us to attach to that. Zero. Which is that they- Zero. It's of internal nature. And the way that I look at- That yields zero. Your honor, the way- We're to afford no significance to the fact that the Colombian Supreme Court has said, as far as we're concerned, there is no treaty. It is unenforceable. The wrong guy signed it. It was never ratified. It's as if it never happened. Your honor, I think it is a correct statement that you should not afford significance to that. And let me explain- Any significance. In this case, no, your honor, because the Colombian government is explaining its own law to the United States. Let's say that there- Another extreme hypothetical. Let's say that there really wasn't a treaty, but the Colombian government in 1982, the executive branch, for whatever reason, decided to submit instruments of ratification. There had been no process internally. There had been nothing. But the executive branch says, well, we're just going to do this anyway. Would we have to defer to that too? The State Department, your honor, would likely conclude that there is no treaty in that instance  Sure, but what if you were standing here telling me that the State Department- Did conclude there is a treaty. That would be contrary to Article 46 of the Vienna Convention on the Law of Treaties, which says that a state may inject a violation of its own internal law to withdraw consent from the treaty if that violation would have been manifest to any party, state actor contracting in that situation. I would posit that your honor's hypothetical would be a situation where that could have been a manifest error. Here, it's far afield from that because once the instruments of ratification were exchanged, my understanding is the treaty was employed at that point. It was used. It was in full force domestically in Colombia, as well as on the international level for four years. And then the Colombian Supreme Court decision came in 1986. Now, it's extremely significant to me, at least- Pursuant to the treaty during that four years before it was held to be unconstitutional? Your honor, my understanding, there are cases that are rules of specialty claims coming- I thought there were nine years with no extradition under the treaty, even after it came into effect. Nobody was extradited for the first nine years. Your honor, my understanding and- Now, we've got what this record shows. This record does not have anything regarding that point in it. What the record does- Exchange of the instruments of ratification, and if so, where? Or is it just a matter of nobody disputes it? No, your honor. I would point to Documentary 37-1, which is a declaration from the Assistant Legal Advisor at the Department of State, where he states, the treaty entered into force on March 4th, 1982, when the parties exchanged instruments of ratification. It was proclaimed by the President of the United States on March 25th. I have two other questions. I'm looking at two of our cases here that Mr. Marcus cited, and one of them does say the treaty was annulled. That's the Duarte-Acero. Columbia wouldn't extradite Mr. Duarte-Acero. Ecuador finally did. Yes, your honor. And, I mean, he fled to Columbia because Columbia wouldn't extradite him. This was in 2002, and Columbia refused our request. He went back to Ecuador and finally got him back. He killed two DEA agents. We finally got him back, and the court there says the Columbia Treaty, it was annulled. Then I've got another problem. Valencia Trujillo says this. Everybody agrees if he was extradited under the treaty, he would have standing and a private right to enforce the rule of specialty, but we went and said why he's not extradited pursuant to the treaty is because the fact is, and I quote, the treaty was not in effect at the time the defendant was extradited in 1990. The law ratifying the treaty had been struck down. Before I get to everything else you've been arguing, I want to know how I write around these two cases. Would I agree that they're right or not? I think Duarte-Acero is maybe not a holding, but it seems to be a holding in Valencia-Trujillo, so help me with that. Your Honor, I would agree with you that it's not a holding, but the way that I— No, but in Duarte-Acero it's not a holding, but it does say it's annulled. So I think the idea in Valencia-Trujillo is focusing on whether Mr. Valencia-Trujillo himself as an individual defendant was extradited pursuant to the terms of the treaty. Yes, and I agree with that. And they say, no, he's not because—it's not just because we say he was an extradited pursuant to internal law. The case goes further. They say he was not extradited under the treaty because it was not in effect. The fact is, it was not in effect and the law ratifying it has been struck down. So it's beyond, you know, just stick to there. It looks like a holding to me, so help me. Two points, Your Honor. First, the— Why is that not a holding? The holding in the case, Your Honor, is that Mr. Valencia-Trujillo was not extradited pursuant to the treaty. Colombia fulfills its treaty obligation to the United States by employing its domestic law. But it was not extradited pursuant to the treaty because it was not in effect. It was not in domestic— And it had been struck down. It was not in domestic procedural effect in Colombia. Actually, the case— One of the cases upon which Valencia-Trujillo relies, the Gallo case, makes pretty clear in its quote upon which Valencia-Trujillo is— Right, but doesn't— I think the thrust of the question is whether or not the holding necessarily carries within it the legal conclusion that it wasn't in force and effect. Your Honor, I would say— Yes, Your Honor, they could have. And if I may pose an— Tell me how. How could they have done that? Let me pose an example on the United States end that I think might clarify this instance. We receive extradition requests all the time. And there are times that we receive an extradition request from a treaty partner that there is no question that the treaty is in full force and effect. But in order to fulfill our treaty obligation to that partner, we may employ other means to return the fugitive to our treaty partners, such as immigration means. If there's a removal order in effect, we might employ the removal order to return the fugitive. That's, in a sense, analogous to what Colombia does. In that instance, when the United States returns that fugitive via immigration means, the rule of specialty wouldn't attach there either. But it doesn't mean that the treaty is not in effect. Here, what Valencia Trujillo is saying, what the court is saying in that case, is that Mr. Valencia Trujillo himself was not extradited pursuant to the terms of the treaty. The treaty could be in effect or it could not be in effect, and that could be equally true. And that is why I think, Your Honor, that that could be fairly characterized as dicta here. And I think what the court was— Assuming for the purposes of my question, that is holding, not dicta. How do I square it with the statement from the Colombian government that the Treaty of Extradition, which you submitted on their behalf, that the Treaty of Extradition between Colombia and the United States continues currently in force? Well, Your Honor— I'm not looking to pick words here, but the Colombian government tells us today in this accept that it was holding, either in the one case, the other, or both, that it was either annulled or it is not in effect. Your Honor— And I ignore that. Your Honor, but the holding— I mean, do I have to go and bonk to address that? I don't think so, Your Honor, because on one hand, there is the argument that it's dicta. On the other hand, it is distinguishable for the reasons that I've stated. I think it also is saying that the treaty— making the assumptions that we do not agree with. I think it at most is saying that the treaty is not in force in effect and in effect as a matter of domestic Colombian law. And domestic law and international law are sometimes not the same thing and not equivalent. And as the Colombian government has made clear in its diplomatic note, as the Department of State has made clear as a matter of international— The statement that you offered on behalf of the Colombian government said nothing like that. Your Honor, it said in effect— I'll read it to you. Forget what in effect. Let's look at the words that they used. Based on the above— this is coming from the Colombian government— it must be highlighted that the Treaty of Extradition between Colombia and the United States continues, quote, currently in force, comma, in accordance with the international law, comma, and as provided by Article 21, Subsection 4 of the same treaty and of Article 54 of the Vienna Convention, as neither the Republic of Colombia nor the United States have notified themselves their intention of terminating it. A little different from kind of the argument you're making. Your Honor, I'm not certain that I agree with that because in the paragraph directly above— I'm sorry, it is two paragraphs above— they make clear that the actions that happened in Colombia in 1986 are of internal nature and have the consequence that the Republic— that in the Republic of Colombia, the treaty cannot be applied, but they do not affect the validity thereof. I think I may have inartfully stated it, Your Honor, but I believe what I'm saying— Okay, then help me understand. How it is that the treaty cannot be applied because they failed in the ratification process and yet at the same time, it's still currently in force. It's currently in force, Your Honor, as a matter of international law by its own terms because the instruments of ratification were exchanged. Domestically— So two things have to happen for it not to currently be in force, if I hear you right. The first thing that has to happen is the Colombian Supreme Court has to pronounce that the ratification process was no good and the second thing that has to happen is the Colombian government has to formally send a notice of termination. Yes, Your Honor. Unless both things happen, the treaty is necessarily in force. That seems to be the thrust of what you're saying. I think that's correct, Your Honor, and I think it would be analogous on our end if the United States Supreme Court were to, in essence, strike down the implementing legislation of a non-self-executing treaty. It would not mean that the United States does not have that treaty obligation. If the United States were unable to fulfill its treaty obligation, then it would withdraw from the treaty. Well, let's suppose the Supreme Court of the United States were to conclude in a case that the treaty ratification process by the Senate was defective because you didn't have two-thirds vote. You needed 67 senators to make it the law of the land, but nevertheless, they said it was ratified by 56 senators and somebody challenged it in the Supreme Court and the Supreme Court said, yeah, that's right. You need 67. While we don't look behind it very often, plainly on its face, it didn't meet the law, the requirements of two-thirds and yet the government continues to say in pronouncement, as far as we're concerned, it's still good law. That treaty is still in full force and effect, notwithstanding the pronouncement by the court. Your Honor, I think that there is a good case that the treaty is in full force and effect under the Vienna Convention of the Law of Treaties and— Notwithstanding the fact that the Supreme Court had said the treaty process was no good because you didn't have the requisite number of senators to ratify it. I believe that that would create an obligation, potentially, to terminate the treaty according to its terms. You chose not to. There were powerful foreign policy reasons why you wanted to accord the treaty effect for reasons that went far beyond the ratification process. Our treaty partner in that instance, Your Honor, would have a very good case under international law that the treaty remained in force, which is separate and apart from a domestic obligation in the United States. Your view is not where they have a pretty good argument. Your view is it is in force until and unless it had been formally terminated by notice. That's correct, Your Honor. Notwithstanding the defect that went to the very core of ratification. Well, the ratification is the international act. It's not the domestic approval act. If the domestic approval is flawed, then that may create a domestic obligation to terminate the treaty, but it does not independently terminate the treaty on the international plane. Could this court in that situation deny domestic effect to the treaty? Let's say that this exact treaty only got 56 senators, but for whatever reason, the United States still wanted to say that it was in force. In that instance, does this court have authority to say there's no treaty and you can't extradite this person? Your Honors would be interpreting domestic U.S. constitutional law at that moment and as an Article III court, yes, I think you could. And what if the facts were different in this case, and there had been no formal termination by Columbia, but the Colombian government actually said in their affidavit, no, we don't think this treaty is in effect. We haven't submitted the formal documents, but we've not put it into practice internally, and we don't actually think it's in effect, except because we haven't terminated it, you still have to send this person to us. What's the response then? Your Honor, the case law is very clear that deference is still accorded to the State Department's view, but as the court has made clear previously, in some cases that deference is not conclusive, and I think the situation that your Honor posits there could easily be a situation where that would require close examination, but I'd talk about the Supreme Court's case in Charlton v. Kelly, for example, which makes clear that if one party is violating or potentially violating a treaty obligation, the solution is political between the branches. It may make the treaty voidable, but it doesn't necessarily make the treaty void. Here, I think the deference is appropriate to the State Department because that's not what's happened here. What's happened here is, Columbia is the United States' best extradition partner in the world. It sends more fugitives to the United States than any other country. How do they do it? They do it by employing their domestic law. What does that mean? Translate that in English for me. The treaty, your Honor, creates an obligation to extradite. It's Article I of the treaty. The obligation to extradite is fulfilled in Columbia by using their domestic procedures. We send them extradition requests that fulfill the terms of the treaty. They act on those extradition requests under their domestic law, and they send more fugitives to us annually than any other. The treaty is annulled, or at least it's not ratified under Colombian law, but we're going to use it to employ our obligations under local law? I'm sorry. I guess I don't understand if the treaty's gone with the wind in Columbia, what the source of the extradition is in their local law. It's their domestic local extradition law. Many countries, even when there is no question about the treaty's validity, many countries' treaties are not self-executing, so they have their own extradition act in countries that they employ those procedures, which are much more detailed than 3184 that we have here to bring into effect their obligation. Let me ask you one other question that Judge Hall had asked your colleague. What's the status of the asylum proceedings? Your Honor, the government cannot comment on the status of asylum proceedings. I have no reason to dispute the facts that Mr. Marcus has said at this juncture. The one note that I would add to this court is that asylum and extradition are two separate processes. I promise you we understand that, but tell me the case number and I'll try to look up the status of the asylum. Do you have a case number? Your Honor, I don't. You have absolutely no knowledge of it and you have knowledge of it, but don't want to say. I don't have knowledge of it. You don't have knowledge of it. I know what Mr. Marcus has said. That there's one pending. Yes, Your Honor. That there was a petition filed. I have no reason to doubt what Mr. Marcus has said. But you don't know anything beyond that? No, Your Honor. Let me ask you a slightly different question. I had asked your colleague about dual criminality. Help me understand what you have to show on dual criminality as you see it. Your Honor, I believe Your Honor was quoting from Collins v. Loisel on that case. And the paragraph Your Honor was quoting makes clear our domestic legal standard, which is that you have to show that the act itself would be criminal under U.S. law. The act as charged. The charged conduct. Right. You don't look behind it to see whether there's actually sufficient evidence to prove the conduct. Our position, Your Honor, is that you look behind it in the probable cause framework. But then you're only looking at it to see whether it violates foreign law. I mean, there's sort of an asymmetry between how you look at it for probable cause purposes and dual criminality. There may be a bit of asymmetry there, Your Honor. The case law, our case law, I think pretty clearly establishes that you look at the conduct that's been charged as alleged and then you look at probable cause to see if the foreign offense has been committed. And that goes back to Collins. So I don't look behind it? No, Your Honor. For purposes of that? No, and especially not here. I realize I'm conflating this with probable cause at the moment. But as Magistrate Judge Simonton in the report and recommendation, that was adopted by Judge King, stated she cited almost a dozen cases where courts have uniformly held that the judgment of conviction is preclusive. Here's why I asked the question. Help me with it under dual criminality. Suppose I were to look at the Supreme Court opinion, Colombian Supreme Court, and match it up against the requirements of 641 and come away with the conclusion that there wasn't a shard of evidence to establish the element of criminal intent on fraud. Establish the other elements, but not intent. Is that something court can do or that go beyond what we are required to do? I'm not saying that's the case. I'm simply asking the question. It'd go, in the case of a conviction, it goes beyond, Your Honor, the Colombian Supreme Court. We have to accept the conviction as the final statement about whether the evidence otherwise is sufficient on intent? As a matter of comedy and under the treaty, yes. You have three other lawyers with you. Can you confer if anybody can tell us, while we hear rebuttal, about whether the asylum is still pending? Not pending. I'm not doubting Mr. Marcus, but you may have some light. I just want to see if y'all can agree rather than saying we don't have any reason to dispute it. Yes, Your Honor, I'm happy to check. You've got three other lawyers, and maybe somebody knows. Yes, thank you, Your Honor. Thank you very much. I'd ask for the court to affirm. Thank you. And you reserve five minutes. You may proceed. Judge Hall, would you like me to wait while they look that up? Let's see if they know. That's good. Thank you. Maybe nobody there knows. Your Honor, the best information that I can give you is that HCFR 280.6 prevents the government from commenting on asylum applications. Generally, as a practice, all immigration proceedings are stayed during the pendency of an extradition. They give precedence to the extradition. Right. What you can tell us, consistent with that, though, is that it was filed and that it is pending and it hasn't been resolved. It's been stayed. That much you can say. Yes, Your Honor, and I believe that's correct. Thank you very much. Do you have a case number for it? Maybe Mr. Marcus can give us where it's pending and is there a formal order of stay or no? It's just a matter of practice it stayed. It's a matter of practice. There may very well be a formal order and I'm sorry, Your Honor, since it's a separate process, I don't know the case number. I take it your view is it would be wholly immaterial to these proceedings. It would be outside the standard of review. It would violate the rule of non-inquiry and, as the Ninth Circuit said, and bear append. It's a completely separate process. Thank you. Thank you and may it please the Court. Judge Hall, we'll file right after this hearing the case number. I apologize that I don't have it with me, but I'll file it. That's fine. I'm just curious about it. Yes, Your Honor. So I'd like to start with the hypothetical that both Judge Marcus and Judge Grant gave about if the U.S. Supreme Court had found the treaty unconstitutional, what would that mean? That would mean the treaty's not in force. And so we cannot have a one-sided treaty. You did not hear from the government that, and we challenged them to say so, that one extradition in the past 30 years from Colombia was done pursuant to the treaty, and that's because it has never been done. Conduct controls in this case, and I want to make that very clear. The cases, both from this Court and the United States Supreme Court, say that conduct is the controlling factor. They want to talk about notice, international law. This is a question- Aren't those cases, though, in a different context, say the dissolution of the Prussian Empire to see if a treaty remains in effect? I don't think you've got a case that says that the conduct of one country that has remained one country under the same government has abrogated a treaty by its conduct. Right. So I think that cuts in our favor, Your Honor, because even when both sides say the treaty's in effect in those cases, those cases say, well, you still have to look at conduct. In this case, we have Colombia saying, we don't, the treaty is not in effect. We never properly ratified it. And so our case is much stronger than that because we have one party saying we don't extradite pursuant to the treaty, and all the conduct for the past 30 years shows it. You know, the government lawyer said, it's our best extradition partner, except when it doesn't want to be. Except when it doesn't want to be. So we've cataloged all of the examples of all of the people that Colombia doesn't extradite when it chooses not to. And it could not do that if there was an extradition treaty in force. It couldn't say, we're just not, we're going to give a pass to all the FARC members. It could not do that. It would have to because a treaty is reciprocal under Article I of the treaty. The government keeps saying that only internally in Colombia is this not a treaty. That makes no sense. A treaty has to be enforced internally in both countries for there to be a two-sided treaty. What the State Department is asking the court to do is say half a treaty is better than no treaty. And that can't be the case. A treaty has to be enforced, has to be followed. Conduct controls by both sides. And just as a side note, of course, Judge Marcus, the Vienna Convention, which you discussed with the government lawyer, is we are not a party to the Vienna Convention. Our own cases show that conduct is what's important. Finally, what the government said a number of times in its argument is that we shouldn't veer into the ratification question. We are not asking this court to veer into the ratification question. Everyone agrees. The United States agrees. This court agrees. Colombia agrees that the treaty was not ratified in Colombia. Article 21.1 of the treaty requires ratification for it to go in force. It was not ratified. There's no dispute on that. We're not asking the court to decide that question. Because everyone agrees that it was not ratified, the legal question for this court is, if a treaty is not ratified, what's the legal consequence of that? What's the legal consequence of a one-sided treaty? The legal consequence is there is no treaty. That is the point here. I listened with interest as the government lawyer tried to work around this court's holdings, this court's statements about the treaty being annulled, the holding in Valencia Trujillo. I couldn't follow the legal gymnastics. All that I know is that this court has said it. Both sides agree to it. And what that means is, how does this court decide it? The same way Judge Grant, as if the U.S. Supreme Court said, not enough senators ratified it, this court could say, we're not extraditing pursuant to the treaty. This is the mirror image of that. The Columbia Supreme Court has declared the ratification unconstitutional. Did not happen. The contract, the treaty is void. I've used a lot of time this morning. I know we've gone on for a while. I'd ask this court to find what everyone agrees to and what this court has said many times. Thanks very much and thank you all for a well-briefed and well-argued case. We will proceed to the next case.